## Johnson v. Johnson, et al.

(Decided February 6, 1917.)

### Appeal from Pike Circuit Court.

1. Deeds—Quit-claim Deed—Effect of.—A quit-claim deed only transfers to the vendee whatever interest the vendor possessed at the time, and the vendor is not precluded from subsequently acquiring a valid title to the land covered by his quit-claim deed.

2. Deeds—Quit-claim Deed—When Vendor Estopped to Acquire Title Hostile to Vendee.—If a vendor by a quit-claim deed sells land to which he holds the equitable title and afterwards secures the legal title, he will hold the legal title for the benefit of his vendee and cannot assert title under it or in opposition to his vendee.

3. Deeds—Quit-claim Deed—Estoppel of Vendor to Assert Title in Opposition to Vendee.—Where a vendor conveyed land by a quit-claim deed and thereafter secured for his vendee a deed from the real owner of the land covered by the quit-claim deed, the vendor will be estopped from thereafter obtaining for himself a deed from this owner, although the deed made to the vendee by the owner was invalid on account of the infancy of the owner.

O'REAR & WILLIAMS, J. S. CLINE, J. F. BUTLER and J. J. MOORE for appellant.

ROSCOE VANOVER for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This suit was brought by Blaine Johnson against Monroe Johnson to recover the possession of an undivided one-half of eight acres of land that he claimed to be the owner of under a deed executed to him by Elijah Johnson in March, 1913, and he also sought damages for its detention. The petition averred that in August, 1911, Elijah Johnson executed to Monroe Johnson a deed conveying to him this interest, but that Elijah Johnson at that time was an infant under the age of twenty-one years, which fact was well known to Monroe Johnson, and that when Elijah Johnson arrived at age he disaffirmed his conveyance of the land to Monroe Johnson and conveyed it to him.

The answer of Monroe Johnson, which was made a cross-petition against one W. B. Johnson, and also a counter-claim against Blaine Johnson, the plaintiff, after denying the averments of the petition, set up that prior to the execution of the deed by Elijah Johnson to him in August, 1911, Elijah Johnson had executed a

title bond to W. B. Johnson for this land, and it was thereafter conveyed to him by Elijah Johnson at the request of W. B. Johnson who had paid Elijah Johnson the purchase price for the land. That he purchased a large boundary of land from W. B. Johnson for thirty-five hundred dollars, and the land so purchased included the land owned by Elijah Johnson. That at the time he purchased the land from W. B. Johnson, Elijah Johnson had not executed a deed to W. B. Johnson, as he had agreed to do by the terms of the title bond, but at the request of W. B. Johnson he did, in August, 1911, execute a deed in conformity with the title bond directly to him, as he had bought the land from W. B. Johnson.

He further averred that he believed when he accepted the deed from Elijah Johnson that he was twenty-one years of age, and that the interest owned by Elijah Johnson was worth about a thousand dollars. That after he purchased the land from W. B. Johnson and after W. B. Johnson had procured from Elijah Johnson the deed of August, 1911, W. B. Johnson fraudulently and wrongfully persuaded Elijah Johnson, in March, 1913, to execute the deed to Blaine Johnson. He further averred, in substance, that W. B. Johnson and not Blaine Johnson was the real owner of the land which was conveyed to Blaine as part of a scheme conecived by W. B. Johnson for the purpose of defrauding him (Monroe). He prayed that if Blaine Johnson recovered the land, he should have judgment against W. B. and Elijah Johnson for its value, one thousand dollars.

Blaine Johnson controverted in a reply the averments of the pleading of Monroe Johnson in so far as it affected him. And W. B. Johnson in his answer to the cross-petition of Monroe Johnson controverted the allegations of the pleading in so far as it affected him.

Other pleadings were filed by the parties making more specific the issues, but for the purposes of this case the issues are sufficiently set out in the pleadings we have noticed.

After the case had been prepared for trial, there was a judgment cancelling the deed made by Elijah to Monroe Johnson in August, 1911, and awarding to Blaine Johnson the possession and ownership of the land in dispute. From the judgment Monroe Johnson prosecutes this appeal.

Turning now to the evidence we find that in July, 1911, W. B. Johnson, in consideration of thirty-five hundred dollars, conveyed to Monroe Johnson a body of land which included the land here in dispute, but in the general warranty deed made by W. B. to Monroe Johnson, it was recited that "it is intended to only quit-claim and release an interest in and to that part of land in said boundary which was allotted to the heirs of Elijah Johnson, deceased." In other words, by this deed W. B. Johnson warranted the title to the land conveyed to Monroe except as to that part inherited by Elijah Johnson from his father, Elijah Johnson, which is now in dispute. As to that part he only executed a quit-claim deed.

It further appears that in August, 1911, Elijah Johnson, in consideration of one hundred dollars, conveyed to Monroe Johnson his title and interest in the land in dispute that had been previously conveyed to Monroe by W. B. Johnson. The decided weight of the evidence also shows that when Elijah made this deed in August, 1911, he was not twenty-one years old, and it is conceded that soon after his arrival at the age of twenty-one, and in March, 1913, he conveyed this same land to Blaine Johnson. But the real controversy on the facts of this case grows out of the issue made by Monroe Johnson that Blaine Johnson bought the land merely as the agent of W. B. Johnson, who was the real owner of it, and that Blaine Johnson had no interest in it. Proceeding upon this theory, his contention is that the subsequent purchase by Blaine for W. B. Johnson of this land inured to his benefit and he should be adjudged the owner of the land as between himself and W. B. Johnson. This, of course, would further mean that the deed made by Elijah Johnson to Blaine Johnson should be cancelled.

On behalf of W. B. and Blaine Johnson it is argued that Blaine and not W. B. Johnson was the real purchaser and the owner of the land; and further said that although it should be held that Blaine Johnson bought the land for W. B. Johnson, who was the real owner of it, W. B. Johnson had the right to buy it and hold it in opposition to the title of Monroe Johnson, because his quit-claim deed to this piece of land to Monroe did not deprive him of the right to subsequently buy the land for himself and hold it in opposition to the title of Monroe.

On the issue as to whether W. B. Johnson and not Blaine Johnson was, in fact, the real owner of the land conveyed by Elijah in March, 1913, the evidence is quite conflicting, but it clearly shows that W. B. Johnson was wholly instrumental in procuring Elijah to make the deed to Blaine and that Elijah would not have made the deed to Blaine unless he had been advised or directed by W. B. Johnson to do so.

Upon this point Elijah testified that when he made the deed to Monroe he was not twenty-one years old and everybody knew it, but that when he made the deed to Blaine he was over twenty-one. That Blaine gave him fifty dollars to make the deed to him and he told Blaine at the time that he did not want to make the deed because he was under obligations to W. B. to make him the deed.

He further testified that he had previously made a title bond to W. B. for this land and had obligated himself to make him a deed when he became twenty-one. That when Blaine came to his house to get him to make him a deed he told him he would not sell the land until he had seen W. B. or his uncle, Elisha Johnson; that they then went to see W. B. and he told him, in effect, to make the deed to Blaine, and he did so. That he would not have made the deed to Blaine if W. B. had not agreed to it. His evidence also tends to show that W. B. Johnson furnished the fifty dollars that Blaine paid to him for the land.

Elisha Johnson, who took quite a part in getting these deeds from Elijah, testifies that when W. B. Johnson bought the land that he sold to Monroe, he retained a sufficiency of the purchase money to cover the interest of Elijah, who was not then of age and owned, as we have stated, a small parcel of this land, with the understanding that he would pay him for his interest when he could get a deed. This witness further testified that, before Blaine got the deed from Elijah, W. B. wanted him to buy it in partnership for himself and W. B., but he declined to do so, and after the deed had been made to Blaine, W. B. asked him if he wanted a part of the land and he told him he did not.

J. G. Johnson testified that in October, 1912, W. B. Johnson told him he had made a mistake in selling this Elijah Johnson land to Monroe and he intended to try to get it back, and suggested that he would put up the money,

for the witness to buy the land and they would share equally in it.

Agustine Johnson also testified that he had a conversation with W. B. in April, 1913, after the deed to Blaine had been made, in which W. B. told him he was going to put up houses on the land, and in response to an inquiry why he did not take the deed in his own name, W. B. replied that he was afraid he might get into trouble if he did. .

There is other evidence in the ·record tending to show that this land at the time the deed was made to Blaine was worth between eight hundred or a thousand dollars and that W. B., although he had sold the land to Monroe and procured Elijah to make the deed to Monroe in August, 1911, was anxious, on account of its increased value growing out of a railroad prospect, to get possession of the land himself.

A significant fact is the failure of Blaine Johnson to testify, and this failure, in connection with other facts and circumstances shown in the record, some of which we have set out, satisfy us that Blaine Johnson bought this land as the agent of and for the benefit of W. B. Johnson, and that the land was, in fact, owned by W. B. and not Blaine.

Assuming now that W. B. and not Blaine Johnson was the real purchaser of the land from Elijah in March, 1913, the remaining question is, can W. B. hold the land in opposition to the title of Monroe?

It will be observed that in the conveyance by W. B. to Monroe of the large body of land which included this Elijah Johnson parcel, W. B. made only a quit-claim deed to so much of the land as embraced the interest of· Elijah; and so the question narrows down to the issue whether a vendor who makes a quit-claim deed to a parcel of land to which he has not a marketable title, can subsequently procure from the owner of the land covered by his quit-claim deed a perfect title and set up this title against the title of his vendee under the quit-claim deed?

We have not been referred to, nor have we been able to find after quite a careful investigation, a decision of this court on this question. But it has frequently been the subject of consideration by other courts, and the rule announced in Devlin on Deeds, vol. 1, section 27, that "A quit-claim deed purports to release and quit-claim

only whatever interest the grantor possessed at the time." And that "By the use of this form of conveyance he does not thereby affirm the possession of any title and is not precluded from subsequently acquiring a valid title and from attempting to enforce it," is well supported by the authorities: Mosier v. Carter, 35 L. R. A. (N. S.) 1182; Comstock v. Smith, 23 Am. Dec. 670; 13 Pickering (Mass.) 116; Frink v. Darst, 14 Ill. 304, 58 Am. Dec. 575; Wayland's Admr. v. Mosely, 5 Ala. 430, 39 Am. Dec. 335.

Adopting the principle anounced in Devlin and supported by the authorities, if there were no intervening circumstances to take this transaction out of the rule, the title acquired by W. B. Johnson from Elijah in March, 1913, would not inure to the benefit of Monroe Johnson.

But there is a rule of estoppel that we think the circumstances of this case authorize us to apply to W. B. Johnson that will deny him the right to assert his subsequently acquired title in opposition to the title he conveyed Monroe. It will be observed that in the deed to Monroe, W. B. conveyed whatever interest he possessed at the time the conveyance was made. And so the question comes up, what interest did W. B. have in this Elijah Johnson land at the time he made the conveyance to Monroe? Elijah says that he had made a title bond to this land to W. B. Johnson, and if this is so W. B. at the time he sold the land to Monroe was invested with the equitable title, subject of course to the right of Elijah to disaffirm the title bond, which it does not appear he did.

So that at the time W. B. made the quit-claim deed to Monroe for Elijah's interest, he was the equitable owner of this interest and afterwards came into the possession of the legal title. Under these circumstances the quit-claim deed of W. B. which conveyed to Monroe whatever interest he had in the title of Elijah invested Monroe with the equitable interest and title then held by W. B. under the title bond, and when W. B. subsequently acquired the legal title, this legal title vested in Monroe under his quit-claim deed from W. B.

To state it in another way, if a vendor who sells by a quit-claim deed land to which he holds the equitable title, afterwards secures the legal title, he will hold the legal title for the benefit of his vendee and cannot assert

title under it or in opposition to his vendee. This is so because by his quit-claim deed he has parted with all the title he had, and if he owned the equitable title, he transferred it to his vendee, who being entitled to all the benefits, it conferred on him whatever remedy his vendor would have against the person who conveyed to him the equitable title. And so to permit the vendor to set up against his vendee any right he acquired under his equitable title would be allowing him to break the covenants of his quit-claim deed, which transferred to his vendee all the title and interest he had.

We find support for this sound principle in Devlin on Deeds, vol. 3, section 1281b, where it is said, "But if the grantor of a quit-claim deed obtains an instrument evidencing and strengthening the interest purported and intended to be conveyed, the grantee will have the benefit of such instrument." And also in Welch v. Dutton, 79 Ill. (Freeman) 465, where the court held that if a party having the equitable title to land and being entitled to the legal title, conveys the same by a quit-claim deed and subsequently acquires the legal title, it will inure to his grantee. And also in Ford v. Axelson, 74 Neb. 92, where it was held that if a grantee of quit-claim obtains an instrument that evidences and fortifies the very estate or interest which his deed purports and was intended and effectual to convey, such instrument inured to the benefit of his grantee.

But independent of this ground of estoppel, which we think precluded W. B. from setting up his subsequently acquired title in opposition to the title conveyed by his quit-claim deed, we are satisfied that he should be estopped from defeating the interest of Monroe under the quit-claim deed by the title subsequently acquired from Elijah. And this upon the ground that the evidence shows that W. B. when he made the conveyance to Monroe, told Monroe that Elijah was not twenty-one, but that when he arrived at the age of twenty-one he would procure from him a deed of conveyance to Monroe for this interest, and subsequently did procure from Elijah the deed made by Elijah to Monroe in August, 1911, which deed Elijah subsequently disaffirmed at the instigation of W. B.

Now it seems clear to us that when W. B., pursuant to his contract with Monroe, procured Elijah to convey by a deed of general warranty his interest to Monroe,

thereby intending to invest Monroe with the full title of Elijah, W. B. should be estopped from thereafter procuring Elijah to disaffirm his deed to Monroe so that he might convey the land to W. B. and thereby defeat the title of Monroe. To permit W. B. to do this would sanction the commission of a fraud attempted to be perpetrated by him on Monroe and enable W. B. to reap the benefit of the fraud by taking from Monroe land to which he had attempted to give him a good title when he procured Elijah to make him the deed. We would have W. B. procuring Elijah to make a deed to Monroe in order to carry out the contract that he, W. B., had made with Monroe, and afterwards procuring Elijah to repudiate this deed so that he, W. B., might secure the land.

It seems to us that this case presents exceptionally strong reasons, looking at it from any standpoint, for the application of the doctrine of estoppel against W. B. If W. B., having at the time no title, had merely quitclaimed the Elijah Johnson land to Monroe, then W. B. would not have been estopped to subsequently secure for himself the title of Elijah, because in so doing he would not break any covenant he had made with Monroe or assert any title in opposition to the one he conveyed Monroe. But that is not the case we have.

The judgment is reversed, with directions to set aside the deed made by Elijah to Blaine Johnson in 1913, and to adjudge Monroe Johnson the owner of the Elijah Johnson land.